# In the United States Court of Federal Claims

No. 22-1263 C
Filed Under Seal: November 3, 2022
Reissued: November 16, 2022[*]

```
* * * * * * * * * * * * * * ** *
                              *
BAE SYSTEMS NORFOLK SHIP       *
REPAIR, INC.                   *
                              *
              Plaintiff,       *
                              *
        v.                     *
                              *
THE UNITED STATES,             *
                              *
              Defendant,       *
                              *
and                            *
                              *
METRO MACHINE CORP. d/b/a      *
GENERAL DYNAMICS NASSCO-       *
NORFOLK,                       *
                              *
        Defendant-Intervenor.  *
                              *
* * * * * * * * * * * * * * * * *
```

   *Barbara Ann Duncombe*, of Indianapolis, IN, with whom were *Suzanne Sumner*, *Erin R. Davis*, and *Brandon E. Dobyns*, Taft Stettinius and Hollister LLP, all of Dayton, OH, for Plaintiff.

   *Galina Fomenkova*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom was *Steven M. Mager*, Senior Trial Attorney, all of Washington, D.C., for Defendant, and *Bradley S. Garner*, Associate Counsel, Mid-Atlantic Regional Maintenance Center, Naval Sea Systems Command, of Norfolk, VA, of counsel.

   *Noah B. Bleicher*, with whom was *Nathan E. Castellano*, *Scott E. Whitman*, and *Aime J. Joo*, Jenner & Block, LLP, all of Washington, D.C., for Defendant-Intervenor

---

[*] Pursuant to the protective order entered in this case, this opinion was filed initially under seal. The parties did not provide any proposed redactions of confidential or proprietary information; however, the Court did make minor typographical and stylistic corrections to this version of the opinion.

<u>**OPINION AND ORDER**</u>

**SOMERS**, Judge.

On September 8, 2022, Plaintiff, BAE Systems Norfolk Ship Repair, Inc. ("BAE"), filed a pre-award bid protest challenging the United States Department of the Navy's cancellation of a solicitation for proposals to provide maintenance and repair services for the USS Bainbridge (DDG-96) ("Bainbridge"), an Arleigh Burke class guided-missile destroyer. The Navy issued Solicitation No. N50054-22-R0003 ("First Solicitation") on March 15, 2022. BAE was the only contractor to make an offer in response to the First Solicitation, as Defendant-Intervenor, Metro Machine Corp d/b/a General Dynamics NASSCO-Norfolk ("NASSCO"), declined to submit a bid. After several amendments, the Navy cancelled the First Solicitation, and issued Solicitation No. N50054-22-R-0015 ("Second Solicitation"), which relaxed the timeframe within which the successful offeror must place the ship in dry dock. According to the Navy, it cancelled the First Solicitation and issued the Second Solicitation in order to increase competition for the repair and overhaul work on the Bainbridge.

The Navy invoked Federal Acquisition Regulation ("FAR") 15.206(e) as the sole authority for cancelling the First Solicitation. In this pre-award bid protest, Plaintiff argues, *inter alia*, that the Navy did not have a reasonable basis under FAR 15.206(e) to cancel the First Solicitation. As a result, Plaintiff asks the Court to reinstate the First Solicitation and to permanently enjoin the Navy from proceeding with the Second Solicitation. *See* ECF Nos. 33 ("Pl.'s MJAR") and 34 ("Pl.'s Inj. Mot."). The government and Defendant-Intervenor have each cross-moved for judgment on the administrative record. *See* ECF Nos. 37 ("Gov.'s Cross-MJAR") and 38 ("NASSCO's Cross-MJAR"). For the following reasons, the Court denies Plaintiff's motions for judgment on the administrative record and for a permanent injunction, denies in part and grants in part the government's cross-motion, and grants Defendant-Intervenor's cross-motion.

## BACKGROUND

In order to maintain and modernize its fleet, the Navy routinely sends its vessels for routine maintenance, repair, and alterations—often while dry-docked—for varying periods of time known as "availabilities." This bid protest arises out of the Navy's requests for proposals for an availability to provide a "complex ship repair and overhaul" of the Bainbridge. AR 2. According to the solicitations at issue, the Navy is soliciting a Docking Selected Restricted Availability ("DSRA") contract for the maintenance, repair, and modernization of the Bainbridge, during which the awardee will address hundreds of work specific work items. AR 169–1095. The availability for this work is slated to last approximately 250 days. AR 2799. During this availability, some of the necessary work items require dry-docking, which means that, for some period of time, the Bainbridge must be taken out of the water and placed in dry dock. AR 1084–90. As a result, the Navy required offerors to "possess a valid Master Ship Repair Agreement (MSRA) and have access to a NAVSEA Certified Dry-Dock capable of docking (USS BAINBRIDGE DDG-96) in accordance with MIL-STD1625D9SH) in order to receive an award." AR 1161. Moreover, in accordance with federal law regarding naval ship

repair and maintenance,[1] the Navy restricted the place of performance for the Bainbridge DSRA to Norfolk, VA, the home port of the Bainbridge. *Id*.

On October 25, 2021, the Navy promulgated a Sources Sought Announcement for the First Solicitation, which supplied a questionnaire to assess capabilities and requested letters of interest by November 8, 2021. AR 23–24. BAE and NASSCO were the only entities to respond that they intended to submit a proposal. AR 19, 49–51, 53–54. The Navy issued the First Solicitation for the Bainbridge DSRA contract on March 15, 2022, seeking proposals by April 26, 2022. AR 1166. It also asked that if any potential offeror did not intend to make a bid, it notify the Navy accordingly. AR 3034. Amendment 0002 to the First Solicitation extended the proposal due date to May 23, 2022. AR 2725. The Navy estimated that it would make a contract award by October 3, 2022. AR 3034. Under the amended First Solicitation, repair and maintenance were scheduled to begin on November 28, 2022, and conclude on August 3, 2023. AR 2799.[2] Importantly for this protest, the First Solicitation required that the Bainbridge be placed in dry dock during the first 10 percent of its 249-day availability ("10 percent docking requirement"), meaning that the Bainbridge needed to be dry-docked no later than 24 days after November 28, 2022.

It appears from the record that, because of this 10 percent docking requirement, NASSCO advised the Navy, on March 24, 2022, it would not be submitting a bid, explaining that "[a]fter reviewing our scheduled workload and facility options during the period of the USS Bainbridge DSRA, NASSCO-Norfolk regretfully submits a NO BID notification for this solicitation." AR 3342. On May 23, 2022, the Navy reached out to NASSCO because it had not received a bid from NASSCO in response to the First Solicitation. AR 3346. That same day, NASSCO responded, reminding the Navy of its March 24, 2022, email communicating its "intent to no bid the Bainbridge due to not having a drydock available to support the period of performance." *Id*. NASSCO only has one dry dock capable of dry-docking the Bainbridge at its home port. *See* NASSCO Cross-MJAR at 9 n.8.

BAE submitted a proposal on May 23, 2022, in accordance with the amended First Solicitation. AR 3356. BAE was the only offeror to respond to the First Solicitation, and on June 29, 2022, the Navy requested that BAE submit Certified Cost and Pricing Data ("CCPD"), referencing Defense Federal Acquisition Regulation Supplement ("DFARS") § 252.215-7008, which guides military procurements in situations in which only one offeror responds to a solicitation. AR 4187. On July 28, 2022, BAE transmitted the CCPD to the Navy. AR 4207. However, after receiving the CCPD from BAE, on August 9, 2022, the Navy issued Amendment 0006 to the First Solicitation, extending the proposal submission deadline to August 31, 2022.

---

[1] Federal law requires that for ship repair or maintenance expected to last less than ten months, "the Secretary of the Navy shall determine if there is adequate competition available among firms able to perform the work at the homeport of the vessel" before issuing a solicitation for a contract for short-term overhaul, repair, or maintenance for the work thereof. 10 U.S.C. § 8669a(c)(1). If there is adequate competition, the Navy must issue a solicitation and award a contract only to firms able to perform the required work at the home port of the vessel. *Id*.

[2] The Navy made several additional Amendments to the First Solicitation, none of which further altered the project's start or end date. AR 3338.

AR 3060.  The next day, on August 10, 2022, the Navy issued Amendment 0007, which cancelled the First Solicitation pursuant to FAR 15.206(e).  AR 3289.

On August 18, 2022, the Navy issued the Second Solicitation for the Bainbridge DSRA, which provided that proposals were due by September 19, 2022, and that the anticipated award date was November 2, 2022.  AR 9341, 10684.  In the Second Solicitation, the start and end dates of the availability, the scope of work, and terms and conditions remained the same as they were in the First Solicitation, but the 10 percent docking requirement was relaxed.  AR 10684.[3] Specifically, the amendment required the contractor to "accomplish drydocking the ship . . . within the first 10 percent of the contractual period *or a later docking date proposed by the contractor as long as the end of the contract date remains unchanged while meeting all contractual requirements.*"  AR 11336 (emphasis added).  Based on the most recent amendment to the Second Solicitation, proposals were due on September 26, 2022.  AR 11105.

Principally, this protest challenges the reasonableness of the Navy's decision to cancel the First Solicitation under FAR 15.206(e) based on the relaxation of the 10 percent docking requirement.  Plaintiff alleges that the cancellation decision was arbitrary, capricious, and not in accordance with FAR 15.206(e) and the Competition in Contracting Act ("CICA").  *See* ECF No. 1 ("Compl.") at ¶¶ 3, 32–57.  Additionally, Plaintiff contends that the Navy prejudiced it by requiring it to produce CCPD, which it alleges may place it at a disadvantage in responding to the Second Solicitation.  *Id.* at ¶¶ 58–62.  The government and NASSCO both contend that the Navy's decision to cancel the First Solicitation and issue the Second Solicitation was reasonable. *See generally* Gov.'s Cross-MJAR, NASSCO's Cross-MJAR.  Specifically, both the government and NASSCO argue that the Navy cancelled the First Solicitation for the sole purpose of increasing competition for the Bainbridge DSRA by issuing a new solicitation that was likely to lead NASSCO to submit an offer.  Gov.'s Cross-MJAR at 1, NASSCO's Cross-MJAR at 13, 17.

## DISCUSSION

### A.  Legal Standard

The Tucker Act, as amended by the Administrative Dispute Resolution Act, provides the Court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or to the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1).  In such actions, the Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."  *Id.* § 1491(b)(4).  Accordingly, in bid protests, the Court examines whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  Under such review, an "award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure

---

[3] The chart outlining the project's milestones in the original version of the Second Solicitation reflected the removal of the 10 percent docking requirement.  AR 10684.  However, the same change was not reflected in the specification package until Amendment 0005 to the Second Solicitation.  *See* AR 11324, 11336.  The Navy indicated that the failure to make this change in the first iteration of the Second Solicitation was due to an administrative error.  AR 11324; *see also* Gov.'s Cross-MJAR at 6.

involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

On the first ground, "courts have recognized that contracting officers are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." *Id.* (citations and internal quotations omitted). Thus, the Court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1332–33 (citations and internal quotations omitted). On the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (citation and internal quotations omitted). In the case of a negotiated procurement, such as a "best value" procurement, the burden on a plaintiff to prove an award was arbitrary, capricious, an abuse of discretion, or contrary to law is heavier than it is in other protests. *See, e.g.*, *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995 (Fed. Cir. 1996) ("This court . . . must afford great deference to agencies' decisions in relation to procurement.").

Bid protests are generally decided on cross-motions for judgment on the administrative record, pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). RCFC 52.1 requires that the Court "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005). "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id.* at 1355–56. Therefore, in reviewing cross-motions for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014).

However, before the Court can proceed to the merits of a bid protest, a protestor must establish that it has standing. *Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("Standing is a threshold jurisdictional issue, which . . . may be decided without addressing the merits of a determination."); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."). "It is well-established that the plaintiff bears the burden of establishing the court's jurisdiction by a preponderance of the evidence." *Brandt v. United States,* 710 F.3d 1369, 1373 (Fed. Cir. 2013). In bid protests, "[o]nly an 'interested party' has standing to challenge a contract award." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); 28 U.S.C. § 1491(b). This means that in bid protests, standing "is limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001). Accordingly, Plaintiff must prove two elements to establish it has standing: (1) that it is an actual or prospective bidder/offeror, and (2) that it possesses a direct economic interest in the award of the contract. *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015). In the instant protest, no party has questioned Plaintiff's standing, and there does not appear to be any issue of Plaintiff's ability to proceed with this

protest, because it is an actual bidder, and it has demonstrated that it has a direct economic interest in the protest.

## B.    Analysis

According to the Navy, it cancelled the First Solicitation because "FAR 15.206(e) . . . directs cancellation of the solicitation[] and re-issuance of a new solicitation" and "[m]arket research indicates competition will be gained through the issuance of a new [s]olicitation."  AR 3323–24.  Plaintiff contends that this decision to cancel the First Solicitation lacked a reasonable basis and was contrary to procurement law in that it did not comport with the requirements of FAR 15.206(e) and that, even to the extent that it may have, the Navy did not properly document its decision to cancel and reissue the solicitation.  *See* Pl.'s MJAR at 10–28.  Plaintiff also asserts that the Navy's use of FAR 15.206(e) as justification to cancel the First Solicitation was pretextual.  Additionally, Plaintiff argues that it is at a competitive disadvantage in responding to the Second Solicitation because it provided certified cost and pricing data ("CCPD") in response to the First Solicitation.  *See* ECF No. 39 ("Pl.'s Resp.") at 15; Compl. ¶¶ 58–62.  However, at oral argument, Plaintiff's counsel all but acknowledged that this argument was not ripe given that the Navy has not yet determined the outcome of the competition on the Second Solicitation.  Accordingly, although the Court will briefly address Plaintiff's CCPD argument below, this protest primarily surrounds whether the Navy had a reasonable and non-pretextual basis under FAR 15.206(e) to cancel the First Solicitation.

In response to Plaintiff's arguments, the government seeks judgment on the administrative record and attempts to defend the Navy's cancellation—not on the merits of the administrative record's support of a cancellation pursuant to FAR 15.206(e)—but rather, by asserting that all the government must demonstrate is that the Navy had *some* reasonable basis for cancelling the solicitation.  *See* Gov.'s MJAR at 8–23.  In other words, according to the government, if the record supports *any* reasonable basis—be it FAR 15.206(e) or otherwise—for cancelling the solicitation, then the Navy's actions must be sustained.  *See id.*  Conversely, Defendant-Intervenor moves for judgment on the administrative record on the grounds that the Navy's actions were reasonable and consistent with the requirements of FAR 15.206(e).  *See* NASSCO's Cross-MJAR at 17–22.

For the reasons that follow, the Court concurs with Defendant-Intervenor and finds that the Navy had a reasonable basis under FAR 15.206(e) to cancel the First Solicitation.  In addition, the Court determines that (1) Plaintiff has not demonstrated that the Navy's cancellation of the First Solicitation in order to increase competition was pretextual, and (2) Plaintiff's argument regarding CCPD is not ripe for consideration.

### 1.    The Navy's Decision to Cancel the First Solicitation Must be Reasonably Based on FAR 15.206(e)

The fundamental flaw in the government's argument in its motion for judgment on the administrative record is its assertion that review of the Navy's cancellation decision is not constrained by the Navy's stated reason for cancelling the solicitation.  In other words, according to the government, although the Navy stated that it was cancelling the solicitation pursuant to

FAR 15.206(e), so long as some rational basis to cancel the solicitation exists, the Navy's decision must be upheld. *See, e.g.*, ECF No. 42 ("Gov.'s Reply") at 6 ("In effect, FAR 15.206(e) . . . is not the lodestar for determining whether that cancellation was proper. The relevant standard here is whether the Navy had a reasonable basis to cancel the first solicitation . . . ."). This argument, however, is an approach to defending administrative action the Supreme Court has consistently rejected, including most recently in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020).

As the Supreme Court explained in *Regents*, "[t]he basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted." *Id.* at 1909. The *Regents* decision, as it acknowledges, was not treading any new ground in reaching this conclusion: "[i]t is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.' *Id.* at 1907 (quoting *Michigan v. Env't. Prot. Agency*, 576 U.S. 743, 758 (2015)). In the instant protest, the Navy invoked FAR 15.206(e) to justify cancellation of the First Solicitation; therefore, the Navy's cancellation decision rises and falls in accordance with whether the administrative record supports a reasonable basis for cancellation under FAR 15.206(e). *See id.* at 1907–09; AR 3323–34.

The government is of course correct that the Navy may have possessed some other reasonable basis apart from FAR 15.206(e) for cancelling the First Solicitation. In fact, the administrative record has some information that could potentially have supported a reasonable basis for a best interest cancellation of the related solicitation for repair and overhaul work on the USS Ross. *See, e.g.*, FAR 15.305(b) ("The source selection authority may reject all proposals received in response to a solicitation, if doing so is in the best interest of the Government."). For instance, it may be that the deliberations that appear on pages 3305–3309 of the administrative record would support a best interest cancellation of the First Solicitation, but the Navy did not invoke best interests in cancelling the First Solicitation and, even if it had, this record material relates to the Ross not the Bainbridge. More importantly though, allowing government counsel to search the record for an alternative, post hoc explanation for the cancellation decision would be akin to the approach rejected in *Regents* regarding what an agency is permitted to do on remand. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (explaining that "courts may not accept . . . counsel's *post hoc* rationalizations for agency action"). As Chief Justice Roberts explained, the agency does not get a second bite at the apple on remand to provide a new, alternative explanation for its decision-making; rather, "[w]hen an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) *but may not provide new ones.*'" *Regents*, 140 S. Ct. at 1908 (alteration in original) (emphasis added) (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam)). The only avenue for an agency to provide a new explanation for its decision-making is "by taking new agency action." *Regents*, 140 S. Ct. at 1908. Although, "[a]n agency taking this route is not limited to its prior reasons, [it] must comply with the procedural requirements for new agency action." *Id.*

Here, the Navy's cancellation decision gave a "determinative reason for the final action taken;" therefore, the Justice Department may not come into this Court and "provide new ones." *Id.*; *see also Gerber v. Norton*, 294 F.3d 173, 184 (D.C. Cir. 2002) ("[Courts] do not generally give credence to such post hoc rationalizations, but rather consider only the regulatory rationale

actually offered by the agency [at the time of such action]." (citations and internal quotations omitted)).  Instead, the government is limited here to either defend the Navy's actions based on FAR 15.206(e) or move for a remand to the Navy to rescind the cancellation decision and "take[] new agency action" to re-cancel the First Solicitation.  *See Regents*, 140 S. Ct. at 1908 ("The District Court's remand thus presented DHS with a choice: rest on the Duke Memorandum while elaborating on its prior reasoning, or issue a new rescission bolstered by new reasons absent from the Duke Memorandum.").  Allowing the government to argue that the Navy's "broad discretion" in cancelling solicitations permitted what was done here regardless of FAR 15.206(e) would be just the type of impermissible "post hoc rationalization" the Supreme Court has forbidden.  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Moreover, even if the Court were to have entertained such a post hoc argument, the government provided no alternative authority for the Navy's cancellation in any event.  The only guiding principle the government provided was that the Navy's decision must have been "otherwise reasonable."  Pl.'s MJAR at 17.  But this is a Department of Defense solicitation and, according to 10 U.S.C. § 3303(c), a provision of the statutory scheme governing military contracts, "[e]xcept as provided in section 3301(b) of this title, the head of the agency shall award a contract with reasonable promptness to the responsible source whose proposal is the most advantageous to the United States, considering only cost or price and the other factors included in the solicitation."  10 U.S.C. § 3303(c).  Stated differently, at least for military procurements, the default rule is that a solicited contract shall be awarded.  The exception to this default rule, which is "the only statutory basis for refusing to make any award at all," *Seventh Dimension, LLC v. United States*, 160 Fed. Cl. 1, 17 (2022), provides that "[a]ll sealed bids or competitive proposals received in response to a solicitation may be rejected if the head of the agency determines that such action is in the public interest."  10 U.S.C. § 3301(b).[4]  In other words, the government is simply incorrect in its statement that the Navy has some untethered, plenary cancellation authority that is only limited by reasonableness.[5]  Rather, these Title 10 provisions provide that an award must be made unless the Secretary of the Navy determines it would be in the public interest not to award.  *See Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 119 (2020) (finding agency violated 10 U.S.C. § 3301(b) when "[b]ased on the Administrative Record, the Court was unable to find the involvement of the agency head in a cancellation decision, [or] any delegation of authority by the head of agency to the contracting officer to make a cancellation decision . . .").  CICA also provides an avenue for the Navy to cancel a solicitation and that is precisely the route the Navy chose here by invoking the authority of FAR 15.206(e), a provision that helps ensure that CICA's competition requirements are met.  *See Seventh Dimension*, 160 Fed. Cl. at 18–20.

---

[4] "[T]here is no meaningful difference between the decision to reject all bids or to cancel the entire solicitation."  *Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 126 n.3 (2010) (citing *FFTF Restoration Co., LLC v. United States*, 86 Fed. Cl. 226, 237 n.15 (2009)).

[5] The Army made a similar argument in *Seventh Dimension*, but Judge Solomson similarly struck it down, explaining that the government "ignore[d] the language of FAR 15.206(e), which is the only provision upon which the government now relies."  160 Fed. Cl. at 30.  Likewise, here, the Navy canceled the First Solicitation "in accordance with FAR 15.206(e)," mentioning no other legal authority.  *See* AR 3289.

Furthermore, the government incorrectly argues that even if the Navy's use of FAR 15.206(e) to cancel the First Solicitation was somehow improper, because the Navy only needed to act reasonably, any resulting error would be harmless.  According to the government, the administrative record shows that Navy acted reasonably so the Court can essentially look past any failure to demonstrate compliance with FAR 15.206(e).  Unfortunately for the government, this harmless error argument was rejected in *Regents*.  140 S. Ct. at 1909 ("The Government . . . protests that requiring a new decision before considering [the Secretary's] new justifications would be 'an idle and useless formality.'  Procedural requirements can often seem such.  But here the rule serves important values of administrative law.") (quoting *NLRB v. Wyman-Gordon Co*., 394 U.S. 759, 766, n.6 (1969) (plurality opinion) (citations omitted)).  In other words, just because the Navy could have cancelled the First Solicitation for some reason apart from FAR 15.206(e), does not mean that the Court may ignore the Navy's stated reason.  If the Navy wanted to invoke some other cancellation authority, such as 10 U.S.C. § 3301(b) or FAR 15.305(b), it would have to go back and re-cancel the solicitation on that basis.  Again, Chief Justice Roberts explained the reasons for not applying the harmless error standard the government argues for in this protest:

> Requiring a new decision before considering new reasons promotes "agency accountability," *Bowen v. American Hospital Assn*., 476 U.S. 610, 643 (1986), by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority.  Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply "convenient litigating position[s]." *Christopher v. SmithKline Beecham Corp*., 567 U.S. 142, 155 (2012) (internal quotation marks omitted).  Permitting agencies to invoke belated justifications, on the other hand, can upset "the orderly functioning of the process of review," *SEC v. Chenery Corp*., 318 U. S. 80, 94 (1943), forcing both litigants and courts to chase a moving target.

*Regents*, 140 S. Ct. at 1909.

Simply put, the fact that the Navy could have cancelled this solicitation for a whole host of reasons, does not somehow obviate the need for the government to defend the cancellation decision based on the reason stated in the administrative record: to increase competition pursuant to FAR 15.206(e).  To the extent that the government's motion for judgment on the administrative record argues that all it needs to demonstrate here is that the Navy had some reasonable basis for cancelling the First Solicitation, the government's motion is denied.

### 2.     The Decision to Cancel the First Solicitation Satisfies FAR 15.206(e)

As explained above, the government invoked FAR 15.206(e) as the sole authority for cancelling the First Solicitation; therefore, the reasonableness of its decision must be determined in accordance with that provision.  FAR 15.206(e) provides that:

> If, *in the judgment of the contracting officer, based on market research or otherwise*, an amendment proposed for issuance after offers have been received is *so substantial as to exceed what prospective offerors reasonably could have*

*anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them*, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition.

48 C.F.R. § 15.206(e) (emphasis added).

Generally, FAR 15.206(e) is invoked in the bid protest context in two different situations. First, a disappointed offeror may utilize the provision to challenge a contract award because an amendment made after bids were submitted "changed a solicitation or contract requirement that was previously determinative of the elimination" of such offeror. *Golden Mfg. Co., Inc. v. United States*, 107 Fed. Cl. 264, 276 (2012). Second, and relevant here, a putative awardee may challenge the decision by an agency to cancel a solicitation by claiming the agency failed to satisfy the requirements of FAR 15.206(e) when it cancelled a solicitation after offers were received. *Seventh Dimension*, 160 Fed. Cl. at 20. Under the first scenario, an increase in competition is presumed because the disappointed offeror would have bid if the amendment to the solicitation was a contract requirement from the inception. *Id*. ("[T]he fact that a plaintiff is seeking cancellation of an award (and a concomitant reprocurement) itself provides evidence of the likelihood of increased competition, assuming the plaintiff is otherwise an 'interested party,' 28 U.S.C. § 1491(b), and can demonstrate prejudice on the merits."). Under the second scenario, the contracting officer must "have some concrete basis for concluding" that the amendment is so substantial as to exceed what prospective offerors reasonably could have anticipated so that additional sources likely would have submitted offers had the substance of the amendment been known to them. *Id*.

Plaintiff argues that the Navy has run afoul of FAR 15.206(e) in two respects. First, it contends that nothing in the administrative record reflects that the contracting officer's decision to cancel the First Solicitation was "based on market research or otherwise." *See* Pl.'s MJAR at 10-26. Second, it contends that the relaxation of the 10 percent docking requirement was not a change a sufficiently substantial change under FAR 15.206(e). *See id*. Plaintiff fails to prove either of its contentions.

### a.    The contracting officer's judgment was informed by "market research or otherwise"

FAR 15.206(e) requires that the contracting officer's judgment regarding the 10 percent docking requirement amendment be "based on market research or otherwise." 48 C.F.R. § 15.206(e). This requirement places a restraint on the contracting officer's judgment in that the contracting officer's judgment in assessing whether cancellation is required must be "based on *evidence* or *facts* in the administrative record," not assumptions or conjecture. *Seventh Dimension*, 160 Fed. Cl. at 26; *see also id*. at 25 (noting that under FAR 15.206(e) the contracting officer does "not have plenary authority to cancel the Solicitation and that the CO's judgment that there would be more offers must be based on something in the record") (internal marks omitted). Although this does not mean that a contracting officer must be certain based on the market research that an amendment would not be anticipated and would lead to additional offers, it does mean that the contracting officer must have "a *reasonable basis* for concluding

that a proposed amendment rises to the level contemplated by the regulation." *Madison Servs., Inc.*, 92 Fed. Cl. at 126.

Plaintiff asserts that the administrative record contains no market research or otherwise from which the contracting officer could have reasonably concluded that relaxation of the 10 percent docking requirement was a substantial amendment under FAR 15.206(e). Pl.'s MJAR at 21 ("The AR also reflects that the Navy conducted no additional market research to determine whether a substantial change to the First Solicitation would elicit more bids."). Rather, according to Plaintiff, the administrative record "shows nothing more than mere speculation that such a change to the requirements would encourage NASSCO to bid." *Id.* at 18. Instead of being based on market research, Plaintiff contends that the Navy worked backwards by first deciding it wanted competition and then simply conjured up an amendment to justify cancelling the First Solicitation. *Id.* at 21–22. In what seems to be an accusation of pretext by the Navy (discussed separately below), Plaintiff argues that the relaxation of the 10 percent docking requirement was simply an excuse to provide a basis for the Navy to award the Bainbridge DSRA to NASSCO for reasons unrelated to competition. *Id.* at 22–23 ("Since NASSCO indicated it could not meet the drydock schedule, the reason for the relaxation of the schedule in . . . the Second Solicitation is clear—to allow NASSCO to bid[] and win the contract . . . .").

Conversely, the government and NASSCO counter that the Navy has clearly demonstrated that the contracting officer's decision was based on market research.[6] The government contends that the Navy's communications with NASSCO were "market research or otherwise," which "'made it clear that the *only* reason competition was not obtained was the restrictions of the dry-dock requirement.'" Gov.'s Cross-MJAR at 20 (citing AR 3323). Moreover, NASSCO asserts that the contracting officer engaged in communications with NASSCO and conducted other data-driven analysis to determine that the 10 percent docking requirement was the reason NASSCO did not bid on the Bainbridge DSRA and that this is sufficient to satisfy the requirements of FAR 15.206(e). NASSCO's Cross-MJAR at 10–12, 18–22. The Court concurs with the government and NASSCO.

Despite Plaintiff's contentions and its preferred reading of the administrative record, the Court finds that there was sufficient market research to inform the contracting officer's judgment that cancellation was necessary.[7] FAR § 2.101 defines "market research" as "collecting and

---

[6] As discussed above, the government's primary argument in support of its motion for judgment on the administrative record is that the Navy was not restricted by FAR 15.206(e) in making its cancellation decision and that instead the Navy need only show that its decision was reasonable. *See* Gov.'s Cross-MJAR at 16–20. Nonetheless, the government did address, in part, how the Navy's decision comported with FAR 15.206(e), including the "market research or otherwise" component. *Id.* at 20.

[7] Although there are relatively few cases discussing FAR 15.206(e), judges of this Court that have examined the provision have interpreted the phrase "market research or otherwise" differently. *Compare Seventh Dimension*, 160 Fed Cl. at 24 ("Accordingly, this Court interprets the phrased 'based on market research or otherwise' to mean 'based on market research or evidence similar to market research') *with Madison Servs., Inc.*, 92 Fed. Cl. at 128 (concluding that "'based on market research or otherwise' . . . is naturally read to mean 'based on market research or otherwise based'"). The main issue regarding this difference in interpretation is the phrase "or otherwise." Fortunately, the Court need not grapple with the

analyzing information about capabilities within the market to satisfy agency needs." 48 C.F.R. § 2.101.  Nothing in the FAR's definition prescribes or limits the way in which an agency may collect information.  Furthermore, FAR 10.002 provides that "market research may include . . . [c]ontacting knowledgeable individuals in Government and industry regarding market capabilities to meet requirements." 48 C.F.R. § 10.002(b)(2)(i).  It also states that "[t]he extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience." *Id.* at § 10.002(b)(1).

Given the statutory mandate that the Bainbridge be serviced at its home port in Norfolk, VA, the relevant market of contractors capable of completing the work called for in the solicitations is exceedingly small, and thus makes "collecting and analyzing information about capabilities within the market" simpler than it may be in other instances.  48 C.F.R. § 2.101. There is no dispute that Plaintiff and NASSCO were the only two entities capable of performing the repair and overhaul work called for in the solicitations in the Norfolk area, and they were the only contractors to respond to the Sources Sought Announcement.[8]  The parties confirmed as much during oral argument when directly asked by the Court whether other potential capable offerors exist.  ECF No. 47 ("Arg. Transcript"), at 13:5–7; 69:1–8; 90:4–6.  As a result of this extremely small market of available contractors "[t]he extent of market research" required here was not exceedingly high.  48 C.F.R. § 10.002(b)(1).  With the initial market research that was conducted to identify how many potential, capable offerors existed already completed, AR 17– 21, an email or phone call between the Navy and NASSCO was enough to satisfy the market research requirement.  That is to say, the Navy knew there were only two potential offerors based on its initial market research; only two potential offerors replied to the Sources Sought Announcement; and one potential offeror did not submit a proposal.  Therefore, only one market research question remained: why did NASSCO decide not to submit a proposal in response to the First Solicitation?  The Navy did not need to hire a rocket scientist to conduct market research to answer this question.

Rather, and contrary to Plaintiff's assertions, the administrative record contains market research sufficient to support a finding that the contracting officer had a reasonable basis for the exercise of her judgment in cancelling the First Solicitation:

- The administrative record shows that the Navy conducted market research before issuing the First Solicitation that demonstrated that there were only two companies capable of performing the Bainbridge DSRA at its home port.  AR 17–21, 49–50, 53– 54, 1100.
- The administrative record shows that in response to the Sources Sought Announcement only two potential offerors replied.  AR 23–24.
- The administrative record shows that the Navy communicated with NASSCO to inquire why it did not make an offer in response to the First Solicitation, and NASSCO responded that it did not bid on the Bainbridge DSRA "due to not having a

---

meaning of "or otherwise," as the administrative record demonstrates that the Navy conducted "market research" upon which the contracting officer based her decision.
    [8] All of the parties agree that BAE and NASSCO were the only possible competitors for the Bainbridge procurement.  *See* Pl.'s Resp. at 12; Gov.'s Cross-MJAR at 3; NASSCO's Cross-MJAR at 6, 18.

drydock available to support the period of performance."  AR 3339; *see also* AR 3306 ("BAINBRIDGE FY23 DSRA only received one bid (BAE Norfolk) due to restrictive docking milestones that precluded NASSCO's participation.").

- The administrative record shows that the Navy considered data and charts regarding current and projected workloads and docking availability in Norfolk for both BAE and NASSCO.  AR 3315, AR 3321–22.
- The administrative record shows that Navy personnel had email and telephone conversations discussing the decision to cancel the First Solicitation.  AR 3325–34.
- The administrative record contains a memorandum to file summarizing the information that led the contracting officer to cancel the First Solicitation, which "made it clear that the only reason competition was not obtained was the restrictions of the dry-dock requirement."  AR 3323–24.

Simply put, the market research that justified cancellation was not complicated.  There were only two capable potential offerors.  One bid, the other did not.  The reason that only one potential offeror bid was dry dock availability.  The contracting officer had at least two crucial pieces of information in front of her indicating that the reason NASSCO did not bid on the First Solicitation was the 10 percent docking requirement: 1) NASSCO's own statement that dry dock availability was the reason it did not bid; and 2) charts showing that it was not possible for NASSCO to dry-dock the Bainbridge within the first 10 percent of its availability because the USS Iwo Jima would still be occupying NASSCO's single dry dock.  This is all the market research that was needed.

Plaintiff's attempt to analogize the market research here to the lack of market research in *Seventh Dimension* is unavailing.  Pl.'s MJAR at 17–18 (citing 160 Fed. Cl. at 25).  Unlike the instant protest, in *Seventh Dimension*, the Army could not point to any market research or otherwise in the administrative record and, in fact, counsel for the government in that protest conceded the lack of such research at oral argument.  160 Fed. Cl. at 21 ("The administrative record, however, contains no such market research supporting the cancellation decision — indeed, the government concedes that point as well.").  Here, market research existed, and it was documented in the administrative record.  In other words, as opposed to the facts of *Seventh Dimension*, the Navy relied on more than "a mere hypothesis or conjecture that competition likely would increase were the Solicitation cancelled." *Id*. at 26.  Rather, the contracting officer's decision was a "reasoned judgment based on evidence and facts contained in the administrative record." *Id*. (emphasis omitted).

**b.  Relaxation of the 10 percent docking requirement was a "substantial" amendment under FAR 15.206(e)**

FAR 15.206(e) further requires that, based on the above market research, the contracting officer must in her judgment have concluded that the 10 percent docking requirement amendment was "so substantial as to exceed what prospective offerors reasonably could have anticipated, so that additional sources likely would have submitted offers had the substance of the amendment been known to them . . . ."  48 C.F.R. § 15.206(e).  Plaintiff asserts that this substantiality requirement was not satisfied in this case.  According to Plaintiff, the substantiality requirement is not met as the Second Solicitation is essentially identical to the First Solicitation

because the "scope of work and terms and conditions remained substantially unchanged with only minor revisions." Pl.'s MJAR at 7.  Moreover, Plaintiff argues that the only substantive change—the relaxation of the 10 percent docking requirement—was not "so substantial as to exceed what prospective offerors reasonably could have anticipated." *Id*. at 16 (citing FAR 15.206(e)); *see also* Pl.'s Resp. at 11.  Rather, Plaintiff contends that docking dates are routinely moved and that amendments to the First Solicitation changed the start date for the availability; therefore, NASSCO reasonably could have anticipated a change to the 10 percent docking requirement  Pl.'s MJAR at 19; Pl.'s Resp. at 12.  The government and NASSCO, of course, disagree with Plaintiff's assertions, arguing that the change was so substantial that it could not have been anticipated and was likely to increase competition.  With regard to whether the change could have been anticipated, NASSCO asks: "how could NASSCO or BAE have anticipated—especially given the highly restrictive docking requirements of the Original Bainbridge RFP—that the Navy would eventually provide that the inflexible dry-docking '10% rule will not be strictly enforced allowing contractor flexibility to propose a later docking date. . . .'?"  NASSCO MJAR at 21.  And with regard to whether the change likely would have increased competition, NASSCO asserts that "[w]hile BAE . . . with its multiple dry-docks has always been able to compete for the BAINBRIDGE DSRA—the reality is that these changes were unquestionably substantial to NASSCO, directly impacting the shipyard's ability to compete for and perform the maintenance availability." *Id*. at 22.

Therefore, the critical question for the Court is whether the amendment relaxing the 10 percent docking requirement was so substantial that (1) it exceeded what prospective offerors reasonably could have anticipated and (2) made it likely that additional sources would have submitted offers had the substance of the amendment been known to them.  In making this determination, the Court is guided by the fact that the substantiality of the amendment "is a matter of degree varying from one contract to another," *Saddler v. United States*, 152 Ct. Cl. 557, 561 (1961), and that "[t]here is no exact formula . . . .  Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole," *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180, 194 (1965).  In short, "whether 'an amendment proposed for issuance' is 'so substantial' . . . is not subject to any precise mathematical analysis." *Seventh Dimension*, 161 Fed. Cl. at 20 (citing *Air-A-Plane Corp. v. United States*, 187 Ct. Cl. 269, 276 (1969)).  For example, in some contexts, changing 85 percent of the scope of work in a solicitation would be substantial, but if in a particular solicitation the contracting officer thought offerors would anticipate such a change or that such a change would not make it likely that additional sources would have submitted offers, then the change would not reach the FAR 15.206(e) substantiality threshold.

Turning to the instant procurement, based on the administrative record, the Court can readily conclude that prospective offerors would not have anticipated the relaxation of the 10 percent docking requirement.  First, one must look at what the 10 percent docking requirement actually is—it is a contractual commitment that by approximately December 22, 2022, the successful offeror will put the Bainbridge in dry dock in Norfolk, VA.  Therefore, in order to bid on the contract, a prospective offeror would need to have a dry dock large enough to accommodate the Bainbridge available on or about December 22, 2022.  Failure to have a dry dock available could result in breach of the Bainbridge DSRA.  So, while in a general sense, all

14

contractors are aware that deadlines and timelines in government procurements shift, here the docking milestone—given the limited availability of companies capable of doing the work and having a dry dock that will fit the Bainbridge—is not a minor deadline that a contractor can work around.  In other words, bidding on the Bainbridge DSRA hoping that the time to commence dry-docking was going to change would not have been a prudent course for a prospective contractor to take.  If NASSCO was the successful awardee but did not have its single dry dock available by December 22, 2022, it would have found itself in breach of one of the major requirements of the Bainbridge DSRA.  *See* AR 2799 (listing major contract milestones).

Second, while dates in government procurements may change, and it may be the case that the Navy has upon occasion relaxed a 10 percent docking requirement, Plaintiff in its response brief actually introduced evidence outside of the administrative record indicating that NASSCO questioned whether the 10 percent docking requirement could be relaxed in two recent Navy availabilities, and the Navy responded that it could *not*.  ECF Nos. 39-1 at 3 and 39-2 at 2.  In response to NASSCO's requests to relax the 10 percent docking requirement for these two recent availabilities, the Navy explained it "will not remove the requirement to have the ship docked within the first 10 percent of the contractual period" (ECF No. 39-1 at 3) and "the requirement to drydock the ship within the first 10% of the availability will not be removed" (ECF No. 39-2 at 2).  The Navy's rejection of NASSCO's previous requests to relax the 10 percent docking requirement supports the notion that NASSCO, as the *only* "other offeror" in this procurement, would *not* anticipate the change.  This is further supported by an unrebutted[9] statement in a declaration submitted by the government, which the Court takes judicial notice of, wherein contracting officer Amy Caraway explains that "[t]ypically a contract requires that the ship be put into dock within 10% of the days of the total availability duration . . . . The dry-dock period is the first major milestone of the contract."  ECF No. 37-1 at ¶ 3.  As such, at least in typical cases, it seems the requirement that a ship be brought to dry dock within the first 10 percent of its availability is standard in these procurements.  In short, Plaintiff does not point to anything in the record that would indicate that NASSCO or Plaintiff would have anticipated a relaxation of the 10 percent docking requirement.  Instead, Plaintiff broadly suggests that dates and deadlines often vary with ship availabilities, "[s]o, it is reasonable that bidders could have anticipated a change to the docking start date."  Pl.'s MJAR at 19.  However, changes to the start date of an availability are not the same thing as the requirement that a ship must be dry-docked within the first 10 percent of its availability.

It appears that what Plaintiff is actually arguing is that it was *possible* that the 10 percent docking requirement would be relaxed.  However, the FAR uses the term "anticipated," which is not a synonym of "possible."  Rather, something is anticipated when it is "look[ed] forward to as certain," *anticipate*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2004), "expect[ed] that something will happen," *anticipate*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/us/dictionary/english/anticipate (last visited Nov. 3, 2022), or "[a]pprehended beforehand, looked for, expected," *anticipated*, OXFORD ENGLISH DICTIONARY (2d ed. 1989).  So, while Plaintiff is correct that it was *possible* that the 10 percent docking

---

[9] Indeed, Plaintiff not only does not rebut the Caraway declaration, it actually concurs with it by referring to the 10 percent docking requirement as "a common requirement in MARMC ship repair solicitations . . . ."  Pl.'s MJAR at 31.

requirement might be relaxed, Plaintiff has offered nothing to demonstrate that such an amendment is one that would have been certain, expected, or probable.

Plaintiff attempts to analogize this case to *Argencord Mach. & Equip., Inc. v. United States*, contending that it provides a good example of an amendment that could have been anticipated and, therefore, not sufficiently substantial. 68 Fed. Cl. 167 (2005). In that case, Judge Williams found that the protester "itself reasonably could have anticipated th[e] amendment" allowing the use of an alternate material because the awardee had supplied similar materials under an earlier contract. *Id.* at 175. As a result, she concluded that the amendment was not "substantial" for purposes of FAR 15.206(e). *Id.* Here, however, Plaintiff has not directed the Court to similar evidence. To the contrary, the only evidence Plaintiff has pointed the Court to regarding anticipation of the 10 percent docking requirement amendment are questionnaires Plaintiff appended to its own response brief that actually demonstrate that under previous solicitations, the government *refused* to relax the 10 percent docking requirement. *See* ECF Nos. 39-1 at 3 and 39-2 at 2. In other words, the only evidence to which Plaintiff has directed the Court refutes—rather than supports—Plaintiff's argument.

In order to be "so substantial," beyond needing to exceed what perspective offerors reasonably could have anticipated, an amendment must also make it likely that additional sources would have submitted offers had the substance of the amendment been known to them. It appears obvious here that this requirement was met. The situation here is unique in terms of additional sources because it is undisputed that there was only one additional source: NASSCO. Thus, the reasonable likelihood must be judged based on whether NASSCO would have submitted a proposal had it known the substance of the amendment. Several factors indicate that it was more than reasonable for the contracting officer to conclude that relaxing the 10 percent docking requirement was likely to cause NASSCO to submit a bid.

First, the administrative record demonstrates that in response to the Sources Sought Announcement, NASSCO indicated its intent to submit a bid for the Bainbridge DSRA: "NASSCO-Norfolk plans to submit a proposal in response to the anticipated solicitation for the FY22 USS BAINBRIDGE DSRA." AR 54. Second, the administrative record indicates that the only reason NASSCO did not end up submitting a proposal was because it could not comply with the 10 percent docking requirement, as it did not have a dry dock available. AR 3339 (May 23, 2022, email from NASSCO to Navy reiterating the intent to no bid the Bainbridge DSRA "due to not having a drydock available to support the period of performance"). Even if this was not the case, the Navy's conclusion that "the only reason competition was not obtained was the restriction of the dry-dock requirement," AR 3323,[10] was still reasonable based on the facts in the administrative record regarding why NASSCO did not originally bid on the Bainbridge DSRA and the market research conducted by the Navy regarding dry dock availability in Norfolk. AR 3321 (chart showing Norfolk docking availabilities). Simply put, the Navy asked NASSCO—the *only* other "additional source[]"—why it did not submit a proposal, and it received a clear response: it had no "drydock available to support the period of performance." AR 3339. With this information in hand and its knowledge of Norfolk dry dock availability, it

---

[10] *See also* AR 3306 ("BAINBRIDGE FY23 DSRA only received one bid (BAE Norfolk) due to restrictive docking milestones that precluded NASSCO's participation.").

was reasonable to conclude that NASSCO "likely would have submitted an offer" if the 10 percent docking requirement was amended.

Plaintiff attempts to get around the relatively simple conclusion that the amendment was so substantial that it could not have been anticipated and was likely to increase competition by pointing the Court to other cases in which an amendment was determined not to be requisitely substantial. For instance, Plaintiff asks the Court to look at *Golden Manufacturing* wherein Judge Bush concluded that an amendment that made changes to "the material type, manufacturing process, evaluative quantities, and included additional variety in each lot" was not sufficiently substantial. Pl.'s MJAR at 18 (citing *Golden Mfg. Co., Inc.*, 107 Fed. Cl. at 277–280). In general terms, Plaintiff's main point appears to be that because the language of the First Solicitation remained virtually intact and the only change was the addition of a mere 26 words relaxing the 10 percent docking requirement and the deletion of the dry dock dates on the Second Solicitation's execution milestones and key event dates chart, this per se could not have been substantial. AR 10684, 11336, 11341. In other words, if changing "the material type, manufacturing process, evaluative quantities, and included additional variety in each lot" was not a substantial change in *Golden Manufacturing*, then, according to Plaintiff, simply changing the docking requirement here also could not have been a substantial change. However, this argument ignores Judge Bush's reasoning that the alterations were not a substantial change because "[i]t [was] not reasonable to presume that a different field of offerors would have responded to the Solicitation if the modest price increases inherent in Amendment 15 had been disclosed . . . ." *Golden Mfg.*, 107 Fed. Cl. at 278. Thus, to paraphrase Judge Bush, it is eminently reasonable to presume that a different field of offerors (NASSCO) would have responded to the First Solicitation if the 10 percent docking requirement was relaxed.

In fact, in this case, it appears that the types of changes to the First Solicitation Plaintiff argues would be sufficiently substantial, would not have led NASSCO to bid on the Bainbridge DSRA. As long as the Bainbridge needed to be placed in dry dock no later than approximately December 22, 2022, NASSCO could not bid on the Bainbridge DSRA because another ship (as discussed below) was occupying its only dry dock in Norfolk capable of dry-docking the Bainbridge. NASSCO did not decline to bid on the Bainbridge because of the scope of work; NASSCO had just bid on a much more complex availability on another Arleigh Burke class destroyer that also required dry-docking in Norfolk. That destroyer's availability and 10 percent docking requirement fell within a window during which NASSCO's dry dock was available. The Bainbridge DSRA and window to begin dry-docking simply did not. Therefore, the amendment that was so substantial as to allow NASSCO to submit an offer was the relaxation of the 10 percent docking requirement.

Finally, in the alternative, Plaintiff argues that relaxing the 10 percent docking requirement was not actually what permitted NASSCO to bid on the Second Solicitation; therefore, even to the extent that the Navy followed FAR 15.206(e), its conclusion that relaxing the 10 percent docking requirement would likely increase competition was unreasonable. As explained by Plaintiff, NASSCO only has one drydock capable of housing a ship the size of the Bainbridge. *See* Pl.'s Resp. at 10 n.6; NASSCO's Cross-MJAR at 9 n.8. However, Plaintiff points out that NASSCO submitted a proposal for a contract on the Ross, also an Arleigh Burke class guided-missile destroyer, with an availability that also begins on November 28, 2022. AR

3312. Proposals for the Ross were due in April 2022, as opposed to May 23, 2022, for the Bainbridge. Pl.'s Resp. at 18. BAE submitted the lowest price, technically acceptable proposal for the Ross, and was awarded the contract. *Id.* at 22; AR 3312. Because NASSCO only has one dry dock capable of fitting an Arleigh Burke class destroyer, Plaintiff asserts that the real reason NASSCO did not bid on the Bainbridge DSRA was because it bid on and expected to win the Ross contract:

> Based upon the critical timing of events, it is clear that NASSCO's comment about "not having a dry-dock available to support the period of performance" referred to the fact that NASSCO would not have a dry dock for USS BAINBRIDGE because the USS ROSS would occupy its dry dock during the same period of performance (in the beginning). It had nothing to do with the timing to get the USS BAINBRIDGE into dock within the 10% docking requirement based on the current schedule of the USS IWO JIMA.

Pl.'s Resp. at 19. Plaintiff, therefore, argues that the relaxation of the 10 percent docking requirement could not have been the "substantial change" that actually brought NASSCO into the competition. Instead, Plaintiff contends that NASSCO made a choice to bid on the Ross availability and not the Bainbridge availability. The real "change" that would increase competition for the Navy here was simply NASSCO not being awarded the Ross contract.

At first blush Plaintiff's argument appears to be a convincing one. However, at oral argument, NASSCO, with information from the administrative record that was clearly before Navy decisionmakers, explained why Plaintiff's argument was incorrect. *See* AR 3312. As NASSCO explained, it is the current drydocking of the Iwo Jima in NASSCO's dry dock that makes it impossible for NASSCO to repair the Bainbridge if the Bainbridge DSRA contains the restrictive 10 percent docking requirement. The Ross contract, even though it also has a 10 percent docking requirement and begins its availability on the same day as the Bainbridge DSRA, is not, in fact, impacted by the dry-docking of the Iwo Jima. This is due to the different availability lengths for the Ross and the Bainbridge. The availability for the Bainbridge is to last from November 28, 2022, until August 3, 2023 (249 days). AR 2799. Therefore, the Bainbridge would have to be drydocked by no later than December 22, 2022, which would mean that the Iwo Jima may still be occupying NASSCO's drydock on the last possible day that the Bainbridge would need to enter dry dock if the 10 percent docking requirement is in place. The Iwo Jima is scheduled to be in until at least mid- to late-December 2022. Pl.'s Resp. at 13 n. 8. Although the Ross availability is also scheduled to begin on November 28, 2022, and has a 10 percent docking requirement, its availability is scheduled to last 515 days, meaning that it could be placed in dry dock as late as January 18, 2023, after the Iwo Jima is scheduled to leave NASSCO's dry dock. *See* Arg. Transcript at 74:11–76:18. In short, the last day to place the Ross in dry dock occurs considerably later than the last day that the Bainbridge must be placed in dry dock if the 10 percent docking requirement is in place, and this explains why NASSCO was able to bid on the Ross but not on the Bainbridge.

In sum, the Court finds that Plaintiff has not demonstrated that the relaxation of the 10 percent docking requirement was not a substantial amendment under FAR 15.206(e).

### 3.      Plaintiff has Not Demonstrated that the Navy's Cancellation Decision was Based on Pretext or Bad Faith

Although not delineated as such in its table of contents or in the headings and subheadings within its brief, it appears that within its argument that the Navy's use of FAR 15.206(e) did not have a reasonable basis, Plaintiff also asserts that the Navy's invocation of FAR 15.206(e) was a pretextual reason to cancel the First Solicitation in order to ensure that Plaintiff was not awarded the Bainbridge DSRA. Plaintiff's argument is that the Navy worked backward from a pre-determined result when it decided to invoke FAR 15.206(e) to cancel the First Solicitation in order to distribute the ship repairs in Norfolk between Plaintiff and NASSCO and thus was determined to award the Bainbridge DSRA to NASSCO. Pl.'s MJAR at 22 ("All [the Navy] really wanted . . . was to receive a proposal from NASSCO so it could award the USS BAINBRIDGE to NASSCO, after having awarded the USS ROSS to BAE."). As proof of this pretextual decision-making, Plaintiff directs the Court to the Navy's consideration of three courses of action ("COAs") the Navy considered taking *with regard to the Ross availability* that allegedly demonstrate that the Navy was simply trying to award the Bainbridge DSRA to NASSCO by cancelling the First Solicitation. AR 3305–3312. Despite its attempts, however, Plaintiff fails to demonstrate that the Navy's cancellation of the First Solicitation was pretextual.

The evidence Plaintiff offers to support its pretext argument are the COAs related to the Navy's concerns with awarding Plaintiff the Ross availability. Apparently, the Navy had "concerns with BAE's performance" and was uncertain about Plaintiff being awarded contracts to work on both the Ross and the Bainbridge at the same time. *See* AR 3305. The Navy thus considered, but rejected, three alternatives for either cancelling or reopening the Ross contract. AR 3305–3312. Within the discussion of these three alternatives, the Navy also mentions that it could revise the solicitation for the Bainbridge "to provide docking milestone flexibility and re-release in order to obtain competition." AR 3306. But nothing in these COAs seems to indicate pretext or bad faith on the part of the Navy. Rather, these seem simply to be discussions of the fact that Plaintiff was just awarded one major availability, was the only competitor for another, and the Navy had some concerns with Plaintiff's past performance. And even though options for awarding NASSCO the Ross contract were discussed, those options were rejected in favor of an option that created more competition for the Bainbridge DSRA. In other words, the Navy chose none of the alternatives discussed (including canceling the award and awarding NASSCO a sole source contract for the Ross), moved forward with awarding Plaintiff that contract, and chose an alternative that allowed Plaintiff to continue to compete for the Bainbridge DSRA along with NASSCO. Any hint of pretext in these discussions likely relates to the simple fact that there are only two competitors for both the Ross and the Bainbridge contracts; therefore, while one could argue that it appears the Navy is somehow favoring NASSCO, that appearance is just a reflection of the fact that NASSCO is literally the only other competitor for both the Ross and Bainbridge contracts.

In addition, much of the factual support that Plaintiff points to in support of its pretext argument and the reason that the Navy cancelled the First Solicitation all relate to achieving more competition. The increase in competition is what makes Plaintiff's pretext argument different from the typical case in which a protestor alleges pretext or bad faith. Normally, if an agency acts in a manner that is pretextual, it is attempting to *avoid* competition. Here, the

Navy's stated purpose for cancellation was to *increase* competition.  *See, e.g.*, AR 3323.  Nonetheless, Plaintiff argues that the record shows that cancellation was "a mere pretext to make an award to NASSCO," the exact opposite of real competition.  Pl.'s Resp. at 7.  However, if the Navy really wanted to ensure that Plaintiff and NASSCO each received one of the availabilities, it could have done so by awarding NASSCO a sole source contract for one of the two availabilities.  *See* 48 C.F.R. § 15.002.  Instead, the Navy chose to proceed with a competitive procurement process for the Bainbridge DSRA.

Furthermore, even to the extent that the record evidence may point toward pretext or bad faith, that simply is not enough for Plaintiff to meet its burden on a pretext claim.  There is a "strong presumption that government contract officials exercise their duties in good faith."  *Am-Pro Prot. Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002); *see also Sanders v. United States Postal Serv.*, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("[T]here is a strong presumption in the law that administrative actions are correct and taken in good faith.").  In order to defeat this presumption, a protestor must present "'well-nigh irrefragable proof'" that the government officials did not act in good faith.  *Croman Corp. v. United States*, 724 F.3d 1357, 1364 (Fed. Cir. 2013) (quoting *Knotts v. United States*, 128 Ct. Cl. 489, 492 (1954)); *see also Torncello v. United States*, 231 Ct. Cl. 20, 45 (1982) ("[T]he government, unlike private parties, is assumed always to act in good faith, subject only to an *extremely difficult* showing by the plaintiff to the contrary." (emphasis added) (citation omitted)).  Here, the portions of the administrative record Plaintiff asserts support its pretext argument do not surmount this high burden.

Another case involving FAR 15.206(e) is illustrative of this point.  In *Madison Services, Inc. v. United States*, the protestor alleged that FEMA used "the prospect of enhanced competition as pretext . . . to divert the work to the incumbent contractor . . . ."  92 Fed. Cl. at 130.  Moreover, the protestor in *Madison Services*, like Plaintiff, attempted to avoid making a bad faith argument, suggesting that pretext could be found without declaring that the government acted in bad faith.  *Compare id.* ("[P]laintiff assiduously avoids using the words 'bad faith' except when arguing that bad faith is 'not essential to establish that a cancellation was a pretext.'") *with* Pl.'s Resp. at 15 ("Pretextual reasons may be an element of bad faith, but not all pretextual reasons amount to bad faith.").  Judge Block rejected the protestor's attempt to walk the tightrope of alleging pretext without bad faith, noting that the two terms are used interchangeably, "[a]nd bad faith is precisely what plaintiff alleges."  *Madison Servs., Inc.*, 92 Fed. Cl. at 130.  The Court agrees with Judge Block and finds that Plaintiff's pretext argument is no different than a claim that the government acted in bad faith, and Plaintiff must meet the high standard of clear and convincing evidence.

As discussed above, Plaintiff does not meet that burden.  The Navy's consideration and rejection of COAs that would have cancelled or reopened the award of the Ross availability to Plaintiff does not rise to the level of clear and convincing evidence that it was acting in bad faith or that the cancellation was pretext to reset the bidding process so NASSCO could win.  Here, the Navy's decision to cancel the First Solicitation meets the standards of FAR 15.206(e) for the reasons explained above.  Plaintiff has not identified any evidence in the administrative record that the Navy's decision to cancel the First Solicitation was motivated by anything other than its desire to have both companies capable of performing the Bainbridge DSRA compete for the

Bainbridge DSRA.  Therefore, the Court concludes that Plaintiff has failed to present "well-nigh irrefragable proof" that the Navy acted pretextually or in bad faith.

### 4.        Plaintiff's Claim Regarding its Transmission of CCPD is Not Ripe

Because Plaintiff was the only offeror under the First Solicitation, DFARS 252.215-7008 required Plaintiff to provide the Navy with Certified Cost and Pricing Data ("CCPD")[11] so that the Navy could "determine whether the price is fair and reasonable."  DFARS 252.215-7008(a)(1).  Plaintiff contends that the Navy's possession of its CCPD will place Plaintiff at a disadvantage in the competition under the Second Solicitation, because the "Navy will be able to examine and consider BAE['s] costs and pricing in much greater detail than it can for any other offeror."  Pl.'s MJAR at 28–33.  Additionally, Plaintiff suggests that if it wanted to make any pricing changes in response to the Second Solicitation, the Navy could question any such changes and be able to undertake a *de facto* price realism analysis.  *Id.* at 29.

In response, the government asserts that Plaintiff's argument regarding the CCPD is not ripe for review because it is based on speculation as to how the Navy may or may not use the CCPD in evaluating proposals under the Second Solicitation.  Gov.'s Cross-MJAR at 20–21.  The government further explains that the Navy is required to evaluate all proposals under the Second Solicitation based on the merits of each proposal.  *Id.* at 22.  Any assumption that the Navy will act improperly runs contrary to the presumption that government officials carry out their duties appropriately.  *Id.* at 24.

At oral argument, Plaintiff essentially conceded that this claim is not yet ripe.  Arg. Transcript at 108:25–109:2; 110:3–15.  To any extent that Plaintiff did not concede this argument, the Court finds that simply assuming, without more, that the Navy's possession of Plaintiff's CCPD from the First Solicitation will somehow negatively impact Plaintiff in the Second Solicitation does not constitute a justiciable injury.  "In considering the justiciability of a bid protest, the United States Court of Appeals for the Federal Circuit has held, '[a] claim is not ripe for judicial review when it is contingent upon future events that may or may not occur.'" *Texas v. United States*, 134 Fed. Cl. 8, 17 (2017) (quoting *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383 (Fed. Cir. 2012)).  Here, Plaintiff's claim regarding the CCPD is clearly not yet justiciable.  Plaintiff speculates that the Navy's possession of its CCPD will place it at a disadvantage in competing for the Second Solicitation, because the Navy *may* improperly use the CCPD.  *See* Pl.'s MJAR at 2 ("Does BAE NSR's submission of [CCPD] under the First Solicitation . . . place BAE NSR at a competitive disadvantage under the Second Solicitation?").  But "anticipation of a future procurement violation is not sufficient to make a claim ripe." *Texas*, 134 Fed. Cl. at 17.  If the Navy does in fact conduct a *de facto* price realism analysis on Plaintiff's proposal under the Second Solicitation, or otherwise improperly uses the CCPD, the time for protesting such violations is after they actually occur.  Plaintiff's conjecture that it may be disadvantaged in the Second Solicitation by the Navy's possession of its CCPD is not properly before this Court in this bid protest; therefore, this claim is hereby dismissed.  *See* RCFC 12(h)(3).

---

[11] The government notes that technically the Navy only received cost and pricing data (not *certified* cost and pricing data) because the data was never certified.  Gov.'s Cross-MJAR at 22 n.10.  Whether or not the data is certified is not relevant to the Court's discussion here.

### 5.    Plaintiff is Not Entitled to Injunctive Relief

The Federal Circuit has explained that the following factors must be considered before entering a permanent injunction: "(1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief." *ACI Techs., Inc. v. United States*, 161 Fed. Cl. 58, 87 (2022) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).  "*Proving success on the merits is a necessary element for a permanent injunction*, but we may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief." *Seventh Dimension*, 160 Fed. Cl. at 34 (emphasis added) (quoting *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018)) (internal marks omitted).  Here, because Plaintiff has not succeeded on the merits, the Court need not balance the three other factors, and Plaintiff is not entitled to injunctive relief.  *ACI Techs.*, 161 Fed. Cl. at 87 (2022).

## CONCLUSION

For the reasons set forth above, Count II of Plaintiff's complaint is **DISMISSED** for lack of subject matter jurisdiction; Plaintiff's motions for judgment on the administrative record and for a permanent injunction are **DENIED**; and Defendant-Intervenor's cross-motion for judgment on the administrative record is **GRANTED**.  In addition, insofar as the government's cross-motion for judgment on the administrative record argues that its decision to cancel a procurement cannot be in violation of FAR 15.206(e), even if that is the ground invoked for cancelling the solicitation, the government's motion is **DENIED**; in all other respects the government's motion is **GRANTED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge